## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| _____ | ) | |
| **KAPTORIA L. SANDERS,** | ) | |
| 14303 Summer Tree Road | ) | |
| Apt. E | ) | |
| Centreville, VA 20121 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 1:19-cv-00712 |
| | ) | |
| **DAVID BERNHARDT,** in his official capacity as | ) | **JURY TRIAL DEMAND** |
| Secretary of Department of the Interior, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## FIRST AMENDED COMPLAINT

1. This is an action against Defendant United States Department of the Interior ("Defendant", "Agency" or "DOI"), for declaratory and injunctive relief and monetary relief.  This Complaint seeks to redress harm that Plaintiff, Ms. Kaptoria Sanders ("Plaintiff" or "Ms. Sanders"), suffered as a result of Defendant subjecting her to discrimination because of her race (African-American) and her sex (female), retaliation for her protected activity, and a hostile work environment.

## JURISDICTION AND VENUE

2. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action raises allegations under federal law including Title VII.

4. Venue is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this Complaint took place in Reston, Virginia where Ms. Sanders performed work for Defendant. Ms. Sanders also resides in Centreville, Virginia within this judicial district.

## PROCEDURAL REQUIREMENTS

5. On or about October 15, 2015, Ms. Sanders met with Mr. Giles, EEO counselor to discuss Mr. Hoyler's discrimination and asked him for options to move forward. He told her that she had to use the EEOC because she was a contractor.

6. On or about October 21, 2015, Ms. Sanders spoke with Troy Baker, the Agency's EEO staff and filed an informal complaint stating that she was being discriminated against by DOI staff based on her race and sex and how she was subjected to harassment and retaliation.

7. Ms. Sanders filed her formal complaint of discrimination on November 30, 2015 stating that she was discriminated against based on race (African- American) and sex (female) when, since September 10, 2015, she was subjected to a hostile work environment that resulted in her being removed from her position as a Program Manager/Lead of the Risk Management Framework Team, under the Agency's contract with Arrow Ventures Enterprises, LLC.

8. On February 19, 2016, DOI dismissed the complaint for failure to state a claim and issued a Final Agency Decision ("FAD"). Ms. Sanders appealed DOI's FAD and on April 30, 2018, the Equal Employment Opportunity Commission, Office of Federal Operations remanded the case back to the Agency for further processing.

9. On September 21, 2018, DOI issued another FAD dismissing her complaint of unlawful employment discrimination under Title VII.

10. On or before December 4, 2018, Ms. Sanders timely appealed the dismissal again, and again on February 6, 2019, the EEOC issued its decision ruling in favor of Ms. Sanders' stating, "the Agency's decision to **again dismiss the formal complaint was improper** and is **REVERSED.** The case is **REMANDED** to the Agency for further processing  from the point  that processing ceased, in accordance with the **Order** below." EEOC Decision. (emph. added).  Also, in its decision, the EEOC offered Ms. Sanders the right to file a civil action in court after one hundred and eighty (180) days of the date she filed her Appeal with the EEOC, which she is exercising in filing this instant lawsuit.

## PARTIES

11. Plaintiff, Kaptoria L. Sanders, is an adult resident of Virginia, and was at all times relevant to this Complaint a joint employee of the United States Department of the Interior and of Tikras Solutions ("Tikras"), a government contractor. Ms. Sanders was the only female, African American Manager working on the Tikras Arrow Ventures contract managing predominantly white males.

12. Plaintiff worked for Defendant at all times relevant to this complaint at its Reston, Virginia location.

## FACTS

13. At the time of her removal from the Tikras-BIA Arrow Ventures Enterprises contract, Ms. Sanders had over fifteen years of experience in information technology, information security assurance, cyber security, risk management, vulnerability assessments, operations, assessment and authorization, and program and project management for executive administration.

14. Ms. Sanders has held prestigious positions at the National Reconnaissance Office (NRO), Central Intelligence Agency (CIA), Federal Bureau of Investigations (FBI), Office of the Director of National Intelligence (ODNI), Department of Interior (DOI), National Oceanic and Atmospheric Administration (NOAA), United States Postal Service (USPS) and currently the United States Air Force.

15. Ms. Sanders has continuously supported United States Government agencies and military over 19 years.

16. Ms. Sanders holds a Master of Business Administration and a Bachelor of Science in Computer Networking.

17. Ms. Sanders also has several professional certifications in her field, with concentrations from business to cyber information technology.

18. Ms. Sanders has worked for Northrop Grumman, Lockheed Martin, General Dynamics Corporation, Booz Allen Hamilton and Raytheon.

**Ms. Sanders' Documented Excellent Performance & Achievements**

19. Ms. Sanders provided Information Technology support to the Department of the Interior Bureau of Indian Affairs ("BIA") via the Tikras-BIA Arrow Ventures Enterprises contract (Contract # - A14PC00064).

20. From October 2014 to October 2015, Ms. Sanders worked on the Tikras-BIA Arrow Ventures Enterprises contract as the "Arrow Ventures Program Manager/Onsite Lead and Risk Management Framework Program Manager".

21. Tikras employed Ms. Sanders directly, issued her paychecks, although Defendant supervised her daily work.

22. Prior to Ms. Sanders coming onboard to BIA the contractors were not invited to Government functions and parties. There was a clear separation between the two. Under Ms. Sanders leadership she was able to improve relations between the government and contractors.

23. Under Ms. Sanders' supervision the BIA contract Option Year 1 was approved and executed. The Tikras CEO, Jason Oliver wrote an email to the team titled Option Year 1, dated March 30, 2015. In this email Mr. Oliver congratulated Ms. Sanders' team on a job well done and expressed appreciation for the teams efforts. Mr. Oliver stated: "It is due to your hard work and excellence that we will be able to continue the work we do for the BIA. The first year of contract has been an eventful one and I truly believe you all have changed the culture of the team and environment for the better."

24. Under Ms. Sanders' supervision the National Indian Oil and Gas Evaluation Management Systems ("NIOGEMS") received an Approval to Operate ("ATO") was approved including all core, and affiliated documentation. This was highly visible by Congress and was a huge joint effort between government and contractors. Her team led all efforts, documented and completed the package. According to Cyber Security Assessment and Management ("CSAM"), DOI's official database of record this is the only complete ATO effort in over six years.

25. Things changed almost instantly for Ms. Sanders when on September 8, 2015, Thomas Hoyler became the new Chief Information Security Officer ("CISO") at Office of Information Management Technology at BIA.

26. Two of the relevant players who led to Ms. Sanders' removal from the Tikras-BIA Arrow Ventures Enterprises contract are Thomas Hoyler and Michael Teal.  These two men worked together years prior on a different BIA contract, SeNET and had a long-standing relationship.

27. Mr. Hoyler was Mr. Teal's direct manager while Mr. Teal worked for SeNet similar to how Mr. Hoyler directly managed Ms. Sanders.

28. In contrast to how he managed Mr. Teal, Mr. Hoyler immediately began undermining Ms. Sanders's accomplishments and questioning her performance even despite Mr. Teal having had documented performance issues.

**Discrimination, Retaliation and Hostile Work Environment**

29. Mr. Hoyler subjected Ms. Sanders to a hostile work environment that resulted in her being fired from her position as a Program Manager/Lead of the Risk Management Framework Team about a month after Mr. Hoyler assumed his position working at the BIA as CISO. He met and spoke directly to her Tikras executive management and threatening the contract, saying he would not make future awards if she continued to work on the contract.

30. On September 10, 2015, A member of Ms. Sanders' team, Mr. Patrick Carroll contacted Ms. Sanders to inform her of the disparaging things Mr. Hoyler and Mr. Teal said about Ms. Sanders. Mr. Carroll relayed his concerns regarding the disturbing conversation he overheard between Mr. Teal (SeNet subcontractor to Tikras employee) and Mr. Hoyler about her team's performance. The conversation detailed how Mr. Teal had not provided any assistance to the team since Ms. Sanders became manager and how he and Mr. Hoyler had discussed the changes to the boundaries and zones which Mr. Hoyler later made.

31. Mr. Teal told Mr. Carroll that Mr. Carroll was required to do whatever Mr. Hoyler and the government client wanted. Mr. Carroll replied that he would not perform work outside of the statement of work required; i.e. he would not. Mr. Teal stated, "**Everyone who doesn't do what the client/Government wants will be fired and I will still be here**," which Mr. Carroll took to be a threat. (emph. added). Mr. Carroll later told Ms. Sanders because he was

concerned how it would affect the team and her as a manager. If she did not do whatever Mr. Hoyler wanted she would be removed as well.

32. Also on September 10, 2015, Ms. Sanders received an email from Mr. Hoyler requesting that she review the FY15 Annual Assurance Statement, which is submitted to the DOI by Phillip Brinkley the Senior Advisory Information Resource ("SAIR").

33. Ms. Sanders noted that a system assessment was missing and requested its addition. Mr. Hoyler replied that Christine Cho, the Deputy SAIR wanted only certain projects listed until the Authority to Operator ("ATO") process was complete. Mr. Hoyler left the site off.  This was Ms. Sanders second time questioning Mr. Hoyler's actions in hiding systems and providing false documentation to DOI.

34. On or about September 11, 2015, Mr. Hoyler began insinuating that Ms. Sanders' team was underperforming in reaching key target goals. He stated to Mr. Brinkley that Ms. Sanders did not know how to use the CSAM database. Ms. Sanders replied that she knew how to use CSAM database,. Mr. Hoyler specifically targeted Ms. Sanders and was always attacking her and criticizing how she was performing despite her not having any documented performance issues and her team winning recognition under her leadership.

35. Mr. Hoyler told Ms. Sanders that her team was to stop participating in Internal Control Reviews.  Ms. Sanders' team was required to participate in these reviews under the Statement of Work.  Ms. Sanders also received a memorandum from Sylvia Burns, the Chief Information Officer at the time, directing her team to perform the FY15 Internal Control Review.  Mr. Brinkley the SAIR, and Mr. Dean the prior CISO mandated the FY15 Internal Control Review was to be performed by Ms. Sanders. Ms. Sanders provided this memoradum to Mr. Hoyler.

36. Mr. Hoyler told Ms. Sanders that team was not to perform assessments, because he was going to change the systems architecture and boundaries. Part of the contract was to audit and assess all systems within the boundary. Mr. Hoyler never made those changes while Ms. Sanders was there, basically stopping her and her team from doing their contractual work to the detriment of DOI.

37. On or about September 14, 2015, Mr. Hoyler cut Ms. Sanders off from communications by excluding her from Government and contractor staff meetings that she had regularly attended in the past and needed to attend to function in her job role. Mr. Hoyler informed Ms. Sanders that the meetings were government only, which was false.

38. On or about September 14, 2015, Ms. Sanders met with Mr. Shlikas and expressed her concerns about the race and gender discrimination, namely how Mr. Hoyler was treating her differently and subjecting her to unwarranted scrutiny by disinviting her from government meetings and instructing her to stop work on the Arrow Ventures contract, while, at the same time, directly assigning work to male employees who were not in management positions.

39. Ms. Sanders told Mr. Shlikas that she believed Mr. Hoyler had a problem with having a "**black woman in a managerial position**".

40. Ms. Sanders observed that Mr. Hoyler did not speak to any of the black females in the Arrow Ventures contract. There was a noticeable difference in how Mr. Hoyler interacted with white males on the program.

41. Two days later, Mr. Hoyler called Ms. Sanders into his office and berated her work on the ATO documentation.

42. Mr. Hoyler made a point of telling Ms. Sanders that he had previously held Ms. Sanders' position as the Risk Management Team Lead.  He also told her that he questioned her ability to successfully execute the position responsibilities.

43. On September 21, 2015, Mr. Hoyler emailed Ms. Sanders asking her to complete a Security Assessment Report to claim that the team was providing continuous monitoring for Approval to Operate ("ATO") on the government systems  although they had not been provided the tools to complete.

44. Ms. Sanders recommended that the two meet to discuss how the goal could be accomplished and to have Mr. Hoyler's expectations met. Mr. Hoyler never responded to Ms. Sanders and never met with her to discuss the project.

45. Mr. Hoyler never attempted to establish a working relationship with Ms. Sanders.  Quite the opposite, from his actions and words it was obvious to Ms. Sanders that he wanted her gone due to him not being able to work with black females let alone black females in management.

46. Ms. Sanders informed Mr. Hoyler that Mr. Dean the prior CISO had required the BIA systems to be on a three-year Approval to Operate ("ATO") cycle because BIA and Ms. Sanders' team did not have the tools or documented process to move forward with Continuous Monitoring, the prerequisite for granting a yearly ATO. Therefore, the annual Security Assessment Report could not state the Continuous Monitoring was occurring.

47. Ms. Sanders believes that Mr. Hoyler refused to meet with her, provide her a way forward or tools to accomplish the project because he did not want her working on the contract.

48. Ms. Sanders filed an IG complaint about these and other issues on October 20, 2015. The IG report stated that Ms. Sanders' findings were accurate and that she had performed according to the requirements in the contract. Ms. Sanders asked the COR if Mr. Hoyler could have her

removed from the contract and was told he could not remove her from the contract, because she followed the contract. However, shortly after Mr. Hoyler's meeting with Tikras management, Ms. Sanders was removed from the contract.

49. Ms. Sanders later learned that Mr. Hoyler told Tikras (Mr. Shlikas) that if she stayed on the contract, he wouldn't renew the Tikras contract and they wouldn't get more work. In making the threat, Mr. Hoyler did not go through the COR, or follow the **CURE** process, where they provide the issues and a timeframe to fix the issues. Mr. Hoyler never filed any complaints against Ms. Sanders.

50. On October 15, 2015, Mr. Hoyler and the contracting officer representative ("COR"), Dee Holmes-Shorter met with Ms. Sanders' management team (Mr. Oliver and Mr. Shlikas) to discuss Ms. Sanders. Mr. Hoyler raised concerns about Sanders' conduct and performance. Mr. Hoyler tarnished Ms. Sanders reputation again by informing them that she added senior project management officials into the discussion with other project managers, which meant she was going over his head. Ms. Sanders provided Mr. Hoyler the information prior to the meeting. Ms. Sanders and Mr. Hoyler had met with Mr. Brinkley and Ms. Cho prior to this meeting to discuss the FY15 ICR process and Mr. Brinkley informed Mr. Hoyler he made the decision to perform the assessments and how they were assessed.

51. On October 16, 2015, after meeting with Ms. Shorter and Mr. Hoyler, Mr. Shlikas and Mr. Oliver met with Ms. Sanders.

52. On October 18, 2015, Ms. Sanders emailed her Tikras supervisors, Mr. Oliver and Mr. Shlikas asking for a list of the documents and information that Mr. Hoyler claimed were missing, explaining she wanted to ensure everything was worked off and completed. Ms.

Sanders wanted to address Hoyler's complaints and move forward under the contract. This information was never provided to Ms. Sanders.

53. The COR indicated to Ms. Sanders, Mr. Oliver and Mr. Shlikas that Ms. Sanders was satisfying the contract requirements.

54. Despite performing to the COR's satisfaction, from September 10, 2015 through October 19, 2015, Ms. Sanders was subjected to harassment where Mr. Hoyler continually scrutinized her work while she was fulfilling the terms of a Statement of Work.

55. 32 days after Ms. Sanders complained about Mr. Hoyler's discrimination, Mr. Hoyler asked Tikras to remove Ms. Sanders from the Tikras-BIA Arrow Ventures Enterprises contract, without going through the contracting officer representative, Ms. Dee Holmes-Shorter, as was required pursuant to Arrow Ventures contract.  Tikras removed Ms. Sanders from the BIA contract based solely on biased information Mr. Hoyler provided to Tikras management.

56. Ms. Sanders was removed from the Tikras-BIA Arrow Ventures Enterprises contract due to her protected activity.  Prior to Mr. Hoyler having Ms. Sanders demoted, Ms. Sanders managed and delegated assignments amongst her team.

57. Mr. Hoyler saw to it that Ms. Sanders was removed from the Tikras-BIA Arrow Ventures Enterprises contract and was replaced by individuals outside of her protected class:  Mr. Ledford (white male) acted in Ms. Sanders place once she was removed from the contract and Mr. Ros (Hispanic male), who previously worked along with Mr. Hoyler on the SeNET team along with Mr. Teal prior and was the Chief Operating Officer for SeNet, the subcontactor to Tikras, was a temporary fill and later hired by Tikras directly to become the Program Manger after Ms. Sanders had left.

58. In addition to removing Ms. Sanders from her management position, she was no longer the onsite lead for Tikras on the new contract. Instead, non-black male employees were given her leadership roles. She was moved to a less favorable position on another contract, National Oceanic and Atmospheric Administration (NOAA) in Silver Spring Maryland. Mr. Jason Oliver was meeting with the NOAA management, doing timecards, approving PTO, and handling all the Tikras decisions. Ms. Sanders had to report to Mr. Oliver on the contract.

59. Tikras did not immediately remove white male employees from their contracts upon receiving customer complaints or requests to reassign those employees to different contracts like they did in Ms. Sanders' case.

60. As an example, Steve Dean, the prior CISO, repeatedly complained about a white male employee named Michael Teal over a one year time span.  Mr. Dean reported that Mr. Teal was not performing his job and was further undermining Mr. Dean's authority.  Mr. Dean raised his concerns verbally to Tikras' Risk Management Team Lead, the Vice President, and the CEO.  Tikras did not remove Mr. Teal from the contract.

61. Mr. Teal is still a SeNet subcontractor employee working on the Tikras contract and was still working on the same contract from which Ms. Sanders was removed.

62. This removal led Tikras to give her the ultimatum that she had to move to a new contract or lose her job with Tikras.

**Ms. Sanders' Additional Protected Activity**

63. In addition to complaining to Mr. Shlikas on September 14, 2015, Ms. Sanders also complained to Mr. Giles, EEO Manager in the Reston Office on or about October 15, 2015, specifically mentioning the sex and race discrimination.

64. On or about October 21, 2015, Ms. Sanders also spoke with Troy Baker, the Agency's EEO staff and filed a Complaint about how she was being discriminated against by DOI staff based on her race and sex and was subjected to harassment and retaliation.

65. Ms. Sanders filed her formal complaint of discrimination against DOI on November 30, 2015 stating that she was discriminated against based on race (African- American) and sex (female) when, since September 10, 2015, she was subjected to a hostile work environment that resulted in her being removed from her position as a Program Manager/Lead of the Risk Management Framework Team, under the Agency's contract with Arrow Ventures Enterprises, LLC.

66. On or about December 29, 2015, Ms. Sanders received a positive employment review and a raise from Tikras management based on her performance on the Tikras-BIA Arrow Ventures Enterprises contract, which shows that she was satisfactorily performing.

**EEOC Determinations**

67. The EEOC found that the "record show[ed] that [Ms. Sanders] performed her duties at the Agency's facility, [and us[ed] Agency equipment."

68. The EEOC additionally found that "the Agency not only provided [Ms. Sanders] with a workspace and computer, but also with an email account, telephone number, and access badge."  the EEOC held that the Agency "controlled [Ms. Sanders] day-to-day work…assigned her work, monitored her, and evaluated her performance." and that "**the CISO, Mr. Hoyler, behaved as if he were Ms. Sanders' supervisor**," **and was largely liable for the apparent hostile work environment**.  "[Mr. Hoyler] controlled which systems were audited, instructed [Ms. Sanders'] to perform continuous monitoring (which could not be performed because the Agency did not have tools in place), and told [Ms.

Sanders] that her team would not participate in the upcoming FY Assurance Statement for Internal Control Review (through which the Agency's compliance with the National Institute of Standards and Technology is assessed), despite meeting such standards was the purpose of the Arrow contract."

**Damages**

69. Mr. Hoyler's micro-aggressions and intimidating statements towards Ms. Sanders got to her. It is no wonder considering that he routinely snubbed, embarrassed, and insulted Ms. Sanders despite her documented work performance.

70. Mr. Hoyler's actions made it difficult to do work. She was always getting emails from him criticizing something she had previously done, and her responses were never good enough for him.

71. Mr. Hoyler tried to make Ms. Sanders and Tikras management believe that she was not doing her job. As an example, Ms. Sanders sent weekly activity status reports to Scott Christenson, Sr. Information Security Officer ("ISSO"). Mr. Hoyler reported to Tikras that she was not providing them.

72. Mr. Hoyler embarrassed and criticized Ms. Sanders' work in front of executive leadership. As an example, he said she did not know how to use the CSAM database and she had to explain to him and leadership the database operations and status of the database.

73. In front of Tikras management, Mr. Hoyler made it seem like Ms. Sanders did not want to do her work or perform her duties; which was not true.

74. Mr. Brinkley Senior Advisor of Information Resources ("SAIR") even noticed how Mr. Hoyler was treating Ms. Sanders and told him to quit attacking her.

75. The hostile environment had Ms. Sanders on "pins and needles" to the point that she became physically ill, missed a lot of work, and was seeing a Counselor due to the work related stress.

76. The work-related stress took a toll on Ms. Sanders' physical health. The removal from the Arrow Ventures contract had a tremendous impact on her emotional and psychological well-being. She felt anxious and depressed after being humiliated by Mr. Hoyler in front of Tikras management, which very publicly mischaracterized her performance and devalued her contributions on the contract.

77. Ms. Sanders experienced depression, and it also affected her homelife. Specifically, Ms. Sanders' family relationships have been affected.

78. When Ms. Sanders learned that DOI had only interviewed Mr. Hoyler and Ms. Cho during the investigation of her legal claims when she had provided the investigator with six other witnesses to contact to corroborate her claims, she experienced depression and disgust.  She was disappointed that the investigation was not thorough given the seriousness of her legal claims.

79. Mr. Hoyler's treatment of her broke down her confidence to the point where she was anxious about managing others due to Mr. Hoyler's unwarranted and biased criticisms of her as a manager.

80. Overall, the discrimination, retaliation, harassment and reputation damage have affected Ms. Sanders mentally, emotionally, physically and financially.

## COUNT I
## DISCRIMINATION IN VIOLATION OF TITLE VII
## OF THE CIVIL RIGHTS ACT OF 1964
### (Race and Sex)

81. Plaintiff Ms. Sanders re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

82. Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of an individual's race or sex.  42 U.S.C. § 2000e-2(a).

83. Ms. Sanders was fully qualified to perform her position on the Arrow Ventures contract and had met or exceeded job expectations in that position.

84. Plaintiff, because of her race and gender, was denied terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended.

85. Despite Ms. Sanders' qualifications for the job and high performance in it, Tikras removed her from the position when Mr. Hoyler complained about her and threatened Tikras management that if they did not remove her from the contract they would not get any further contracts.

86. Tikras did not remove similarly situated white male employees from DOI contracts when Tikras received complaints about those employees.

87. Mr. Hoyler intentionally pressured Mr. Shlikas, Tikras Vice President, and Jason Oliver, Tikras CEO, to take Ms. Sanders off the Arrow Ventures contract.

88. Mr. Shlikas and Mr. Oliver intentionally reassigned Ms. Sanders to a non-managerial, less prestigious position on a contract that was farther away.

89. Defendant's conduct was intentional, malicious, and recklessly indifferent to Ms. Sanders's statutory rights.

16

90. As a direct and proximate result of Defendant's willful, intentional and unlawful conduct, acts and omissions, Plaintiff has suffered, continues to suffer, and will in the future suffer diminished future earning capacity, humiliation, distress, embarrassment, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses, emotional pain and suffering, injury and damages, including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

**COUNT II**
**RETALIATION FOR PARTICIPATION IN PROTECTED ACTIVITY**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

91. Ms. Sanders re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

92. Plaintiff, because of her race and gender, was denied terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended

93. Plaintiff is a person protected by said provisions of Title VII as a black woman.

94. Defendant's discrimination against Plaintiff was an intentional or reckless disregard of Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended.

95. Ms. Sanders engaged in protected activity when she made complaints to management, and the EEO officer about the discrimination, harassment, hostile work environment, and retaliation she was suffering.

96. Defendant was aware of the protected activity in which Ms. Sanders engaged.

97. Defendant through its agents and employees, engaged in retaliation in violation of Title VII in connection with its treatment of Plaintiff and the terms and conditions of Plaintiff's employment.

98. In doing the acts and engaging in the conduct herein alleged, Defendant intended to and did vex, harass, annoy, and cause Plaintiff to suffer and continue to suffer emotional distress.

99. Despite Ms. Sanders's qualifications for the job and documented high performance in it, Mr. Hoyler conspired with Tikras management to remove her from the position after she alleged race and gender discrimination and harassment to Mr. Shlikas.

100.   Mr. Hoyler did not conspire to remove similarly situated Tikras employees who had not alleged discriminatory treatment from contracts.

101.   Mr. Shlikas, Tikras Vice President, and Jason Oliver, Tikras CEO, intentionally took Ms. Sanders off the Arrow Ventures contract after Mr. Hoyler threatened that if they did not remove her from the contract they would not get any further contracts.

102.   Defendant's conduct was intentional, malicious, and recklessly indifferent to Ms. Sanders' statutory rights.

103.   As a direct and proximate result of Defendant's willful, intentional and unlawful conduct, acts and omissions, Plaintiff has suffered, continues to suffer, and will in the future suffer diminished future earning capacity, humiliation, distress, embarrassment, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses, emotional pain and suffering, injury and damages, including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

## **COUNT III: HOSTILE WORK ENVIRONMENT UNDER TITLE VII**

104.   Ms. Sanders re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

105.    Title VII prevents employers from subjecting employees to a hostile work environment due to their membership in a protected status group.

106.    Plaintiff is a person protected by said provisions of Title VII as a black woman.

107.    Defendant created a hostile work environment by allowing Mr. Hoyler to harass Plaintiff due to her protected status group and protected activities, as described herein.

108.    Mr. Hoyler's conduct was based on Ms. Sanders' race and gender and was sufficiently severe or pervasive when it altered the conditions of her employment, and created an abusive and fearful work environment that was imputable to Defendant.

109.    As a direct and proximate result of Defendant's willful, intentional and unlawful conduct, acts and omissions, Plaintiff has suffered, continues to suffer, and will in the future suffer diminished future earning capacity, humiliation, distress, embarrassment, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses, emotional pain and suffering, injury and damages, including damage to her reputation and good will, backpay, litigation expenses including attorney's fees, and consequential damages, and other injuries.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiff Sanders, by counsel, requests this Court to grant judgment against Defendant for all injuries proximately caused by Defendant's unlawful actions, including, but not limited to:

A.      Enter judgment for Plaintiff against Defendant;

B.      Declare that the conduct of Defendant is a willful violation of the Plaintiff's rights as secured by Title VII of the Civil Rights Act of 1964, as amended;

C.  Award Ms. Sanders backpay, compensatory damages, plus past and future pecuniary damages on each of the above-stated Counts;

D.  Award Ms. Sanders remuneration and privileges of employment retroactive to the date of any unlawful action found to have occurred in this case;

E.  Award Sanders pecuniary and out-of-pocket expenses;

F.  Order Defendant to pay all reasonable attorneys' fees, expert costs, court costs, and expenses incurred by Ms. Sanders as a result of Defendant's actions and inactions, as well as pre- and post-judgment interest; and

G.  Order such other equitable and legal relief as the Court deems necessary and appropriate.

## JURY DEMAND

Ms. Sanders seeks trial by jury on all matters and issues that can be so tried.

Dated: June 20, 2019                                   Respectfully submitted,

**KAPTORIA SANDERS**

By Counsel:

____/s/_____
Monique Miles
VSB # 78828
Old Towne Associates, P.C.
216 South Patrick Street
Alexandria, Virginia 22314-3528
Ph: 703-519-6810
Fax: 703-549-0449
mmiles@oldtowneassociates.com

*Attorney for Plaintiff*